## BONHAM v. BONHAM.

(No. 895; Decided May 2nd, 1918; 172 Pac. 333.)

DIVORCE—EVIDENCE—SUFFICIENCY OF GROUNDS—EXTREME CRUELTY.

1. Evidence of mere austerity of temper, petulance of manner, rudeness of language, a want of civil attention, even occasional sallies of passion, if they do not threaten bodily harm, is insufficient to maintain an action for divorce on the ground of cruelty.

ERROR to District Court, Sheridan County; HON. E. C. RAYMOND, Judge.

Action by Virginia A. Bonham against Alfred E. Bonham for divorce. Judgment for defendant and plaintiff brings error.

*F. W. Byrd,* for plaintiff in error.

Divorce is sought on the grounds of extreme cruelty. The evidence showed that defendant's acts of cruelty toward plaintiff had continued for many years and had so impaired the health and peace of mind of the plaintiff that she could not tolerate it any longer, hence this action for divorce. The evidence showed that defendant had been arrested for burglary. The modern rule defining extreme cruelty is clearly set forth in 9th Am. & Eng. Anno. Cases, 1091, as being unjustifiable conduct which grievously wounds the mental feelings of the other spouse, and if it seriously impair the bodily health, or destroys the legitimate ends of matrimony, even though no personal violence be inflicted, it is extreme cruelty. We submit that the record in the present case brings it clearly within the rule, and that the court erred in not granting plaintiff a decree.

*R. E. McNally* and *D. L. Gogerty,* for defendant in error.

The allegations of the petition were not sustained by the evidence. As to defendant's motion for counsel fees and alimony, it will be noted that her application made below for counsel fees and alimony was denied for the reasons set forth in the record. The trial court terminated the case and denied the relief because of insufficiency of evidence, and that judgment should not be disturbed, unless manifestly wrong. (Cummins v. Cummins, 66 N. W. 858; Shuster v. Shuster, 92 N. W. 206; Blair v. Blair, 54 Pac. 364.) This is especially true in cases brought on the ground of mental cruelty. (Andrews v. Andrews, 52 Pac. 299; Fleming v. Fleming, 30 Pac. 567.) The trial court can the better judge the merits of the case having observed the appearance and demeanor of the witnesses. (Hale v. Hale, 135 Pac. 481; Dyer v. Dyer, 118 Pac. 634; Guerin v. Guerin, 88 Pac. 928; McDonald v. McDonald (Cal.), 102 Pac. 927; Avery v. Avery, 82 Pac. 967.) There was no corroboration and this is necessary under our statute. (Comp. Stats. 1910, Sec. 3947.) Plaintiff's testimony re-

vealed many commendable traits of the defendant, and while it also showed him to be possessed of certain faults and shortcomings, they do not appear to have been greater than that of the average person. Much of plaintiff's testimony was frivolous and not deserving of consideration. The burglary charge was dismissed for insufficiency of evidence. (Appeal of Nye, 17 Atl. 619.) The judgment of the court below should be affirmed.

Potter, Chief Justice.

This is an action for divorce brought by Virginia A. Bonham against Alfred E. Bonham. The plaintiff asks in her petition also that a reasonable portion of the property held in defendant's name be awarded to her. At the conclusion of plaintiff's evidence the court rendered a decision and judgment in favor of the defendant; this appearing to have been done without a motion or suggestion on the part of the defendant. The court found that the plaintiff had wholly failed to establish any ground for divorce, or any need for the intervention of the court in adjusting the property rights of the parties. The case is here on error, and the only question presented is the sufficiency of the evidence to sustain the finding and judgment denying plaintiff's right to a divorce.

The parties were married September 8, 1875, and lived together until February 9, 1915, when the plaintiff left the defendant and their home in Sheridan, in this state, and established another home in the same city for herself and a married son, referred to in the evidence as Will, with his five children, who had been making their home with the plaintiff and defendant for several months preceding the separation. That son appears to have had some trouble with his wife, and with his children he came to live with his parents, the parties to this suit, with their consent at the time. The defendant, after a few months, objected to his remaining there at his home with the children, and this seems to have been the chief cause of the difficulty between the plaintiff and defendant resulting in their separation;

the plaintiff defending the son and insisting that he and his children be not compelled to leave the house.

It is alleged as ground for divorce that defendant had been guilty of extreme cruelty to the plaintiff. No act of physical or personal violence is alleged or shown. But the charge of cruelty is based upon certain alleged conduct of the defendant during the married life of the parties, and particularly the last year or two of their life together, consisting principally of occasional outbursts of anger over matters displeasing to him, accompanied by profane language; the defendant having a "miserable temper" as stated by the plaintiff in her testimony; habitual complaints and exhibition of anger upon a presentation of bills for living expenses; threats on one or two occasions when angry to kill himself; accusing the plaintiff of lying to him, the defendant, on one or two occasions during a disagreement concerning the son aforesaid and his failure to secure employment, or when he was angrily complaining about some other matter; during the earlier years of their marriage violently beating his horses; complaining at one time about the plaintiff's wanting and having a special nurse when she was in the hospital for an operation; and one act of violence toward a son then about twelve years old, several years before their separation, when he was angered about something the boy had done. We have not attempted to mention every instance mentioned in the testimony of the exhibition of anger by the defendant during the married life of the parties, but what we have stated indicates generally the facts upon which the plaintiff bases her charges of cruelty. It appears from the testimony of the plaintiff that these outbursts of anger were not as a rule directed toward her. Indeed in very few instances is it shown that the defendant exhibited any anger toward her or because of anything she had or had not done.

There are other acts alleged and testified to by the plaintiff which she says occurred during the early years of their married life, some of which are not at all corroborated and bear no relation to defendant's subsequent conduct com-

plained of, and some shown only by his alleged admission to the plaintiff, such as at one time prior to their marriage that he had been a member of a vigilance committee in Colorado, all of which occurred so many years prior to the separation and are so clearly unrelated to anything occurring subsequently, that they are not entitled to consideration. One act of the defendant is alleged and testified to by the plaintiff, with some corroboration by other witnesses, as having occurred a few months prior to the separation. It is alleged and the plaintiff testifies that a few months prior to the separation the defendant, taking to his assistance an unmarried son then living with him, and the married son above mentioned, removed certain furniture of a tenant from one of his houses, and brought the same to the house where he, the defendant, was living, destroyed some of it and attempted to secrete the remainder; and it is sought by the evidence as to that matter to show that the defendant had burglarized the house and stolen the furniture. But it appears from the plaintiff's evidence that the defendant, after having been arrested, was discharged upon a preliminary hearing before the examining magistrate, and that the furniture which had been taken from the defendant's home upon a search warrant was returned to him by order of said magistrate. And there does not appear to have been any further attempt to hold or prosecute him.

The married son, about whose presence in the home the parties disagreed, testified against his father on his said examination, and the plaintiff offered or was willing to testify against him at that hearing, and she appears to have been very indignant over his discharge, showing her resentment to such an extent as to assert in her testimony that the defendant had "bought off" the prosecuting attorney and examining magistrate, and apparently without anything to justify the assertion except the fact that the prosecuting attorney had not immediately authorized a search warrant when requested to do so, and that defendant was not bound over or held for trial on the charge against him. And it appears also from the plaintiff's testimony, on cross-exam-

ination, that shortly before the hearing aforesaid she had gone to the county and prosecuting attorney proposing or suggesting that the defendant be tried on a charge of insanity; but she explained that she first went to the family doctor and he told her to go to the county attorney. She further testified about that as follows:

"Q. Wasn't Bill trying to railroad your husband to the penitentiary or insane asylum? A. No, sir, he was like me. He was up a stump. Q. Didn't he know enough to get out and leave his father? A. How would you like to get out in the dead of winter with the children? The month of August, when the boy was not working, he had money at that time and was turning in money all the time. Q. So when Mr. Bonham was tried on this charge of larceny, you not only offered to testify against him and Will did testify against him, but you went to the county attorney to try to have him taken up for insanity? A. No, that was before this came up—before Christmas, and this trial never came up until the day before we left home the 8th of February. Q. At that time you said Mr. Bonham was insane? A. We didn't know. We knew he had this sick spell."

It appears that about a year or perhaps two years before the plaintiff left the defendant the latter had a severe sickness, and most of the occasions of the exhibition of temper mentioned in the evidence appear to have occurred after tht. The evidence is to be understood, we think, as showing that after the "sick spell," as it is referred to in the testimony, the defendant became less able to control his feeling of displeasure or his disposition to anger. But during that period his anger seems to have been caused chiefly by the fact that his married son aforesaid, while without steady employment, continued to remain at his house. He expressed a desire that they leave his home, while the plaintiff insisted that they should remain. And, as above indicated, we think it apparent that this became the chief cause of the difficulty between the parties, and the controlling cause of plaintiff leaving the defendant and establishing another home for

herself with her said son and the latter's children. She tes-
tifies that she took care of that home, doing the cooking and
other housework, her son then securing regular employment.

As a part of the evidence indicating that the son Will's
presence in the home was the principal cause of the diffi-
culty, we quote further from plaintiff's cross-examination:

"Q. Referring to the trouble last winter with reference
to the Harris property being stolen, that trouble occurred at
the heighth of the family troubles between Bill and Bill's
family? A. No family troubles had ever been before. He
never began to carry on until afterwards. This was in Oc-
tober that he began. It was soon after that he began to
carry on. Q. October, 1914? A. October—about the 20th,
1914. Q. Then is when your trouble started? A. That is
when he started to carry on about Bill being there with the
children; along in November was the first I heard him say.
It was about the time Will did a little piece of work for you.
Q. What was the nature of this trouble with Bill? A. It
seemed as though he thought that Will wasn't paying in as
much as his share. The boy paid in all he had, all he could
earn and had a chance to earn. He was going every place
in this town knocking him. There wasn't a place that he
didn't knock against Will. Q. You mean to say that he was
knocking against Will all the time? A. He swore that boy
couldn't get a day's work in this town and I'll see that he
can't get a day's work in this town. Q. At the time Bill
came to town, things were congenial then for a while be-
tween Bill and the old man, weren't they? A. For a while.
After he first fetched the children. For a while he was all
right for a while. Q. Three or four months? A. For a
while, yes. Q. During that time Bill worked probably
five or ten days? A. He worked more than all the rest
of them put together, let it be what it was. Q. Mr.
Bonham? A. All the family. Q. Mr. Bonham has no
family of five children, but has some property? A. How's
that? Q. Mr. Bonham has no family of five children, but
has some property, hasn't he? A. He has some property,
of course. Q. He is in a different situation than Bill was

in? A. I should judge yes. Q. Didn't he ask Bill to get a job and go to work? A. Didn't he ask Bill that? Q. Yes. A. I don't think he did, because Bill was working. He even walked to the mines a half dozen times. Q. You say a few days before Thanksgiving, Mr. Bonham reared up and started raising this trouble because Bill wasn't working. Prior to that time and during the months of August, September and October, was Mr. Bonham treating Bill and his family all right? A. He did until after he took those goods. Then he began to rear and tear around then. * * * * Q. Your affection for Mr. Bonham hadn't abated in the least on October 19th or 20th, when this trouble came? At that time you had the very kindest feelings? A. No, sir, not from the time he began to carry on, after he had that sick spell. Nobody can stand such carrying on as he had for months. He wasn't mad at Will, but he was mad at everything he happened to think about. Q. When the trouble started between Bill and his father, you know when that started? A. It was along in November some time, I think it was. Q. Now before that, Bill and his father got along all right? A. As far as I know. Q. Now you and Mr. Bonham were getting along all right at that time? A. No, we wasn't and hadn't for many years."

The plaintiff relies upon the principle, stated in the brief as the modern rule, and citing the note to Goff v. Goff, 9 Ann. Cas. 1091, that any unjustifiable conduct which so grievously wounds the mental feelings of husband or wife, or utterly destroys his or her peace of mind, as to seriously endanger life or impair bodily health, or which utterly destroys the legitimate ends and objects of matrimony, constitutes cruelty, although no physical or personal violence may be inflicted or even threatened, or reasonably apprehended.

If that principle be accepted, a careful examination of the evidence in this case fails to convince us that the trial court erred in holding the evidence insufficient to establish a ground for divorce. It is stated in the same note, and it

seems to be a general rule, that mere austerity of temper,. petulance of manner, rudeness of language, a want of civil attention, even occasional sallies of passion, if they do not threaten bodily harm, do not constitute cruelty. (14 Cyc. 608, and see note to Mosher v. Mosher, 12 L. R. A. (N. S.) 820.) We think it unnecessary to rehearse the evidence more in detail. It would serve no useful purpose to do so. The trial court had not only the evidence contained in this record before it, but the witnesses were also before that court, and the latter was able to consider the testimony of the plaintiff, in view of her appearance on the stand, and to observe her general demeanor as well as her condition as to health and the presence or absence of suffering of mind or body. And that court was in a much better position than this court to determine whether the acts of the defendant complained of had seriously endangered the plaintiff's life or impaired her health. And, considering the long period of time that the parties had lived together and had worked together to accumulate what property they had, that they had raised a family of five children, all of whom had graduated from the high school, as the plaintiff testified, and that most of the angry outbursts and acts of which the plaintiff complains occurred after his sick spell and while he appears to have been annoyed by the continued presence of the married son aforesaid and his children in his home, without the son obtaining employment and contributing as much as he thought he should to the household expenses, we cannot doubt the correctness of the trial court's conclusion.

Some of the property accumulated by the parties consisting of certain lots and improvements appears to have stood in the name of the plaintiff, and she was receiving the income thereof. Moreover, it appears that while the parties were living together neither one had freer access to the family pocketbook than the other. It appears further that the defendant was anxious for the plaintiff to return to him, and in his answer he denies the various charges of cruelty alleged against him, and alleges that the plaintiff left

his home over his protest and against his will, but that it remains as ever open to her and that her presence there is desired and hoped for by him. The judgment will be affirmed.                                    *Affirmed*.

BEARD, J., and BLYDENBURGH, J., concur.